IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

BRIAN KEITH GRAHAM,           )
      Petitioner,              )
                        )          Civil Action No. 7:19-cv-00184
v.                            )
                        )          By: Elizabeth K. Dillon
WARDEN,                       )              United States District Judge
      Respondent.              )

## MEMORANDUM OPINION

Petitioner Brian Keith Graham, a Virginia inmate proceeding *pro se*, filed a petition for

writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his incarceration under a Lee

County Circuit Court criminal judgment entered June 9, 2006,[1] for seven counts of carnal

knowledge in violation of Virginia Code § 18.2-63 (Case Nos. CR02-F0222-18 through 24).

The court sentenced Graham to a total active sentence of 21 years. (Trial R. 288–89.)[2]

Respondent filed a motion to dismiss the petition as untimely and has alleged that all

issues in the petition are procedurally defaulted. Graham has responded, making the matter ripe

for disposition. After careful review of Graham's claims and the entire record of all proceedings

in the state court, the court concludes that Graham's petition was filed past the statute of

limitations, but the court equitably tolls the statute of limitations and deems the petition timely

filed. All of Graham's claims allege ineffective assistance of counsel, which in Virginia can

---

[1] The briefs of both parties recite June 8, 2006, as the date of the sentencing order. Although the hearing
was held on June 8, the sentencing order was entered on June 9, 2006.

[2] Citations herein to "Trial R." refer to the records of the Lee County Circuit Court in Graham's criminal
trial, using the page numbers written in the lower right corner of each page. Citations to "Va. Ct. App. R." refer to
records from the Court of Appeals of Virginia, with those page numbers typed in the lower left corner of each page.
Citations to "Habeas R." refer to the Lee County Circuit Court habeas record, with page numbers typed in the
bottom center of each page. Citations to "Va. S. Ct. R." refer to the records from the Supreme Court of Virginia,
which contain the habeas trial court and appellate records, with typewritten numbers in the lower left corner of each
page.

only be raised for the first time in state post-conviction proceedings. Graham raised all these claims in state court, but Graham's counsel ultimately did not develop most of them. After examining each of the claims under the test set forth in *Martinez v. Ryan*, 566 U.S. 1, 13–15 (2012), the court determines that none of Graham's claims rise to the level of a "substantial constitutional question" as required by *Martinez* and that Graham cannot overcome his procedural default. For this reason, the court will grant the motion to dismiss and will deny Graham a certificate of appealability.

## I. BACKGROUND

### A. Factual Background

This case arises from an alleged sexual relationship between Graham and C.D., who was 14 years old at the time. Although the prosecution and defense each had several witnesses, the crucial testimony supporting Graham's conviction came from C.D. The facts are presented in the light most favorable to the government, the prevailing party at trial.

C.D. had a troubled relationship with her mother, Elaine Frasier, whom she described as drunk and abusive. She had been living with her grandfather, but at age 13, in 2000, she had to return to her mother's home. Her mother sent Graham to pick her up from her grandfather's and bring her home. That was the first time C.D. met Graham, and she was crying because she did not want to go to her mom's home. Graham tried to make her feel better by getting her to laugh.

C.D. testified that Graham frequently visited Elaine's home and played cards with her, her younger brother Darin, and their stepfather. Graham started flirting with her, playing footsies under the coffee table, touching her leg, and holding hands with her under the sofa pillows. C.D. testified that Graham worked for the lady who lived behind Elaine's home, and C.D. would go over and talk to Graham in the tobacco shed and elsewhere. One day, they

walked from the tobacco shed to another shed, and Graham shut the door, pulled up C.D.'s shirt, and began to fondle her breasts, removing them from her bra. She was not comfortable with what he was doing and asked him to stop, which he did. At some point, Elaine stopped allowing Graham to come over.

C.D. did not see or talk to Graham for several weeks after Elaine stopped him from visiting. Then, C.D. and her brother moved back to their grandfather's home. In May 2001, her brother Darin started mowing yards with Graham several evenings each week. Graham would pick Darin up and bring him back to their grandfather's. Graham was also renovating a house on Maple Hill and asked Darin to help. C.D. wanted to help as well. She testified that she painted walls while Graham worked on replacing the floor. On June 30, 2001, after they had been working most of the day, Graham sent Darin outside to play with a BB gun. Then, C.D. said that Graham took her into the bedroom, where he performed oral sex on her and then they had intercourse for the first time. (Darin testified that he ran out of BBs and the door was locked. He looked around the closed blinds and saw Graham lying on top of his sister on the bed.) C.D. and Darin returned home late that evening (past 9:00 p.m.), and her grandfather would not let her assist Graham again.

Despite a social services protective order for Graham to have no contact with C.D. and Darin, C.D. testified that she had sexual relations with Graham at her grandfather's home twice in July 2001. While her grandfather was out drinking, C.D. called Graham to let him know the coast was clear. Graham parked on an outlet road near the water tower behind grandfather's home and snuck down the wooded hill to the back door. Her brother was either at a friend's house or already asleep in bed, and grandfather did not usually return home from drinking until 3:00 a.m., by which time Graham was gone. On July 28, 2001, according to C.D., Graham

picked her up in his pickup truck and took her to the Maple Hill house, where they had sexual relations and then watched TV on the couch before Graham snuck her back to her grandfather's home.

In late August 2001, C.D. told her cousin Maria that she had had sex with Graham. A few days later, Maria told her mother, Patricia Coomer. Mrs. Coomer testified that she asked C.D. if C.D. had told Maria that. C.D. admitted she had said it. The next day, September 7, 2001, Mrs. Coomer and C.D.'s grandfather swore out a criminal warrant against Graham, returnable for preliminary hearing on October 25, 2001.

C.D. was very upset about the warrant and called Graham the same day to say she was sorry. She testified that she called from Graham's cell phone, which he had loaned her so she could call him. Graham told her that she needed to tell the court it did not happen. She then testified that she continued talking to Graham on the cell phone several times throughout September, and on October 3, invited him over to her room when her grandfather went out to drink. On October 3, she said they had sex three different times at two-hour intervals. Graham had to sneak out of the house around 3:00 a.m. after her grandfather had gotten home.

C.D. admitted that, at the preliminary hearing in the Juvenile and Domestic Relations Court on October 25, 2001, she told the court that nothing had happened and that she made it all up. She said she had lied then because she was trying to protect Graham. She thought she was in love with him and did not want to get him in trouble. On October 28, 2001, C.D.'s 15th birthday, Graham sent her flowers at school. He sent her flowers at the high school on two other occasions as well, plus he sent her letters, delivered to her at school by one of two classmates, either Patricia Horner or Summer Noe (who also testified for the prosecution). C.D. identified the stack of letters Graham sent her between her 15th birthday and February or March of 2002,

when she asked him to stop writing her, because she wanted to be in a relationship with someone that she could see without getting in trouble.  C.D. acknowledged that she had no direct in-person contact with Graham after the October 2001 court hearing.

Graham categorically denied having sexual relations with C.D.  He denied being with her at her grandfather's house when her grandfather wasn't home, and he denied having romantic feelings towards her, describing his relationship with her as "brotherly."  He said he talked to C.D. because she needed someone to talk to about her messed up home situation.  He denied giving her a cell phone and identified the records from his cell phone account.  He denied that he had relations with her at the house on Maple Hill, noting that the house had no interior doors, no blinds, no curtains, no bed, and no other furniture.  He indicated that he was with his sister and her boyfriend on June 30, 2001, shooting off fireworks by the lake.  Most evenings in July, he was mowing yards.  On October 3, he had gone to an 11:00 p.m. movie in Middlesboro with his sister and her boyfriend.  Various aspects of his testimony were corroborated by his sister, a paternal cousin, and an ex-girlfriend.

On cross examination, over strenuous objection from Graham's counsel, the prosecutor read eleven passages from the letters that Graham had written to C.D. after her 15th birthday, including:

> I love you so much, too much is not enough.  Bring it on, baby doll.  I'll hug you up, shake you up and make you smile, (stutter) ha, ha, ha. And when and where, I know how, and you know what or why.  Let me show you, okay.  I don't suffer from my insanity, you do, I just enjoy it like you.  Think pounding, hammering, ramming, hard, rough, gentle, top, slamming.  Ha, ha, ha.  Let the river run down your legs, drop by drop.  Soon, very soon, you wait. Me, I want and more. Your heart is lying beside me, with me always.  Love you bunches.

(Tr., vol. 2, at 582.)

5

> How on earth can we ever, are we ever going to pick out seven
> names, sorry, eight names. Do I need to buy a book of names, a
> big book or a little one? Eight twins would be cool, or triplets, oh
> wow. Guess we'll need to practice a lot for triplets. I'm up for it.
> How about you, three times a day for a month should do it. We
> just can't do it doggie style, why we might end up with puppies.

(*Id.* at 585–86.) Graham admitted writing all the passages but claimed he was "b-s-ing with

her." (*Id.* at 581.) He said he was trying to scare her away from him and into dating boys her

own age and that he "said a lot of stupid things" in the letters. (*Id.* at 575–79, 591.)

## B. Procedural Background

Much of this case's lengthy procedural background is set forth in the Lee County Circuit

Court's order dismissing the last of Graham's state habeas claims. (Va. S. Ct. R. 28–36.) In

September 2001, Graham was arrested and charged with carnal knowledge of a child at least 13

years old, but not yet 15. A preliminary hearing was held in Juvenile and Domestic Relations

Court on October 25, 2001, at which time the complaining witness, C.D., told the judge she had

lied and that nothing had happened between her and Graham. Based on her testimony, the court

dismissed the charges against Graham. (*Id.* at 28.)

On November 1, 2002, a grand jury in Lee County issued an indictment against Graham,

charging eight counts of carnal knowledge of C.D. on various dates between June 30 and

October 3, 2001. The matter initially came for trial on August 12, 2004, but that ended in a

mistrial because one of the jurors realized that he had previously been C.D.'s church counselor.

The case next proceeded to trial on April 21, 2005. After three days of evidence, on April 25,

2005, the jury deadlocked. The trial court granted the defense motion to strike one count of the

indictment because the government offered no evidence of any sexual contact between Graham

and C.D. on that date. As to the remaining seven counts, the court declared a mistrial. (*Id.* at 28–29.)

For the third time, Graham faced a jury on April 15, 2006, for the seven remaining counts. Following the three-day trial and deliberations, the jury returned verdicts of guilty on all seven counts. At the sentencing phase, Graham's 2005 conviction for possession of drugs by a prisoner was the only additional evidence. The jury recommended a sentence of three years on each count, plus a $1000.00 fine on each count. After consideration of the presentence report at a hearing on June 8, 2006, the trial court sentenced Graham in accord with the jury's recommendation, running each count consecutively, by order entered June 9, 2006. (*Id.* at 29.) After counsel filed a motion for reconsideration of the sentence, the court placed the sentencing order in abeyance by order entered June 29, 2006. (Trial R. 297.) The trial court heard arguments on the motion for reconsideration of sentence on June 28 and August 21, 2006, and denied the motion. The court entered an order reinstating the sentencing order on August 24, 2006. (*Id.* at 331.)

Graham appealed his conviction and sentence to the Court of Appeals of Virginia, arguing that the trial court erred in allowing the prosecution to impeach his testimony of a platonic "brotherly" relationship by asking him about the passages in his letters. Counsel argued that the letters were not relevant, since Graham wrote them when C.D. was 15, after the alleged sexual relationship was over, and at a time when he no longer had any direct personal contact with her. To the extent they were relevant, she argued they were more prejudicial than probative. The court denied the appeal in a per curiam opinion dated April 25, 2007. (Va. Ct. App. R. 73–76.) Graham's request for rehearing was refused as untimely. (*Id.* at 80.) Counsel also failed to file a timely appeal to the Supreme Court of Virginia, and the court granted leave

for Graham to file a delayed appeal and appointed him new counsel. (*Id.* at 86–87.) The Supreme Court of Virginia refused the petition for appeal on November 18, 2008. (*Id.* at 94.) Graham did not file a petition with the United States Supreme Court.

Having taken his direct appeal to the state's highest court, Graham then filed a timely petition for state habeas relief in Lee County Circuit Court on November 9, 2009, raising 19 claims. The state filed a motion to dismiss, and then Graham filed an amended petition. The matter remained on the court's docket for quite some time, during which defense counsel withdrew and new counsel was appointed three different times, causing further delay. The initial hearing on the state habeas was finally held on November 16, 2015. (Va. S. Ct. R. 29–30.) The court entered an order on August 12, 2016, captioned "Final Order," finding that Graham had failed to state a claim for which relief could be granted on claims IV, V, VI, XII, XIV, XV, XVI, and XVII, and granting leave to amend those claims within 60 days from the date of the order. The court dismissed Graham's remaining claims, either on the merits or as procedurally defaulted. (*Id.* at 31–35.) On motion by Graham's counsel, the court orally abeyed the August 12 order and gave counsel 10 days to submit written objections and additional arguments on the claims dismissed by the court; the order was memorialized in detailed handwritten bench notes dated August 31, 2016. (Habeas R. 205.) Graham's counsel filed written objections on September 12, 2016, and the state filed its response on September 19, 2016.

After considering the additional arguments of counsel, the court overruled Graham's objections and entered an order on January 11, 2017, explaining the grounds for overruling the objections. (*Id.* at 237–41.) The order acknowledged that the court previously suspended the August 12 order for counsel to address objections, but the court also stated that "Any prior ruling of the Court–specifically with respect to claims and rulings made in the August 12 Order–

*remains in full force and effect*.  This Order is intended to clarify and supplement the August 12 Order."  (*Id.* at 237 (emphasis added).)  Within 30 days of the January 11 order, counsel filed a notice of appeal.  While the appeal of the dismissed claims was pending, the parties operated under the assumption that the 60 days for amending the remaining claims had started anew on January 11.  On March 8, 2017, Graham filed an agreed motion requesting an extension of time to file the amended claims.  (*Id.* at 253–55.)  On April 6, 2017, the court entered the agreed order, extending the deadline for amending claims to April 25, 2017.  (*Id.* at 261.)  Pursuant to the order, Graham filed his amended petition on April 25, 2017.  (*Id.* at 262–80.)

Meanwhile, on April 11, 2017, Graham's counsel had filed the petition for appeal from the dismissed claims.  On April 28, 2017, the state filed a motion to dismiss the appeal without prejudice because the order appealed from (January 11, 2017) was not a final order because not all claims had been resolved, as the amended petition was still pending.  In a footnote, the state acknowledged that "The court's order of August 12, 2016 was captioned 'Final Order,' however, [sic] the substance of the order made clear that it was not truly a final order."  (Va. S. Ct. R. 25 n.1.)  Because the entire matter had not been resolved, the state argued, Graham's appeal was premature.

On June 23, 2017, the Supreme Court of Virginia dismissed the appeal, with prejudice, finding that counsel filed the notice of appeal too late.  Contrary to the state's argument, the court took the position that the August 12, 2016 order became final 60 days after entry, unless Graham had filed his amended petition during that 60 days.  Because Graham did not file his petition within 60 days, the order became final on October 11, 2016.  To be timely, Graham would have had to file the appeal within 30 days of October 11, 2016 (months before the lower court's opinion of January 11, 2017).  The Supreme Court of Virginia further held that the lower

court did not enter an order suspending the August 12 order.  (*Id.* at 37.)  Graham's petition for rehearing was denied on October 6, 2017.  (*Id.* at 43.)

Back in the circuit court, on October 16, 2017, the court ordered the state to respond to the amended habeas claims.  (Habeas R. 285.)  Newly armed with the Supreme Court of Virginia's orders, the state filed a motion to dismiss the amended petition on the grounds that the court no longer had any jurisdiction over the case.  The state argued that the judgment had become final on October 11, 2016, when Graham had not yet filed an amended petition within the required 60 days.  Further, during the 21 days after October 11, no order was entered to suspend, abey, or modify the order.  After considering the state's motion and the high court opinions, the court entered an opinion and final order on February 7, 2018, dismissing the amended petition for lack of jurisdiction.  (*Id.* at 351–58.)  The court acknowledged having entered orders and granted motions in the case after the August 12, 2016 order had become final, but he noted that the August 12 order specifically stated, "Petitioner will have 60 days *from the entry of this Order* to file an amended petition for the claims which the court granted leave to amend."  (*Id.* at 352 (quoting final order entered Aug. 12, 2016) (emphasis added).)  Further, the order of January 11, 2017, said that the August 12 order remained in full force and effect.  Finding that "No agreement between the parties and this Court could have changed the authority, or lack thereof, granted to this Court," the habeas court was compelled to dismiss the amended petition.  (*Id.* at 357.)

Graham appealed the dismissal to the Supreme Court of Virginia, which denied the appeal on October 2, 2018.  (Va. S. Ct. R. 57.)  The petition for rehearing was denied on November 20, 2018.  (*Id.* at 98.)

Graham filed the current § 2254 petition by placing it in the prison mail on February 14, 2019, and this court received and docketed the petition on February 21, 2019. (Pet., Dkt. No. 1, at 17.) His petition raises the following allegations of ineffective assistance of counsel:

(1) Counsel failed to conduct a proper and full voir dire of the panel;

(2) Counsel failed to request a mistrial when Summer Noe gave improper, prejudicial, and inadmissible testimony;

(3) Counsel failed to adequately prepare for trial by failing to obtain the transcript of the 2005 trial to impeach witnesses regarding discrepancies between their 2005 testimony and their 2006 testimony;

(4) Counsel failed to subpoena John Bishop and Elaine Frasier as witnesses;

(5) (mis-numbered as 6 in the petition) Counsel failed to make effective use of the testimony of Alice Graham;

(6) Counsel failed to enter Graham's cell phone records into evidence;

(7) Counsel failed to object to C.D.'s hearsay testimony that she was not allowed to see Graham anymore because he had allegedly touched another little girl; and

(8) Graham was denied the right to a fair opportunity to develop the merits of his claims during the state habeas proceedings.

Claims one and two above were dismissed on the merits by the habeas court in the order entered August 12, 2016. Claims three through seven were claims that the court gave Graham leave to amend within 60 days, but they were not amended before the court determined that it no longer had jurisdiction. Claim eight is not an ineffective assistance claim, but a claim that he was denied the opportunity to develop his ineffective assistance claims in state court.

## II. DISCUSSION

## A. Procedural Requirements

As amended by the Antiterrorism and Effective Death Penalty Act (AEDPA), the federal habeas statute requires state prisoners to meet several procedural hurdles before a federal court may grant relief. First, the petitioner must timely file his claim. 28 U.S.C. § 2244(d). Next, he must exhaust his state court remedies before filing in federal court. 28 U.S.C. § 2254(b)(1)(A).

### 1. Timeliness

As applicable to this case, 28 U.S.C. § 2244(d) states:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation shall run from the latest of—
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> ****
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

### a. Statutory time calculation

For purposes of calculating the deadline for filing his § 2254 petition, Graham's state court judgment became final 90 days after the Supreme Court of Virginia denied his appeal, the last date on which he could have petitioned the United States Supreme Court for a writ of certiorari. Ninety days after that November 18, 2008 decision is February 16, 2009. The one-

year statute of limitations began running at that time.  28 U.S.C. § 2244(d)(1)(A).  Absent

tolling, the last date for filing his habeas petition in this court was February 16, 2010.

The statute provides for tolling of the limitation period while a properly filed application

for state post-conviction relief is pending.  Specifically, "the time during which" the state habeas

proceeding is pending "shall not be counted toward" the limitation period.  28 U.S.C.

§ 2244(d)(2).  Unlike § 2244(d)(1)(A), § 2244(d)(2) does not delay when the statute starts

running.  Rather, the statute starts running when the state judgment becomes final, but the clock

is stopped when a properly filed state post-conviction application is pending.  When the state

action is no longer pending, the clock resumes at the point where it was when it stopped; the

statute does not begin anew.  *Harris v. Hutchinson,* 209 F.3d 325, 327 (4th Cir. 2000).

According to the habeas court's final order, Graham properly filed his state petition on

November 9, 2009.  (Va. S. Ct. R. 351.)  That filing stopped the 365-day federal statute of

limitations after 266 days had passed.  The clock remained paused until the state action was "no

longer pending."  According to the opinion of the Supreme Court of Virginia, the final order of

August 12, 2016, gave Graham until October 11, 2016, to file his amended petition or suffer

dismissal of the remaining claims.  Because no amended petition was filed by October 11, 2016,

the state habeas was dismissed, and the 30-day limit for appealing that dismissal began to run.

When the 30-day appeal window expired, on November 10, 2016, the 365-day clock picked up

where it had left off, with 99 days remaining.  The federal statute of limitations expired on

February 23, 2017.  His § 2254 petition was placed in the prison mail on February 14, 2019,

nearly two years after the statute expired.

*b. Equitable tolling*

The Supreme Court has recognized that the statute of limitations for habeas petitions under AEDPA is subject to equitable tolling. *Holland v. Florida*, 560 U.S. 631, 636 (2010). A petitioner must show (1) that he has been pursuing his rights diligently and that (2) some extraordinary circumstances prevented his timely filing. *Id.* at 649.

Graham diligently pursued his rights. He filed a timely state habeas petition. When the Supreme Court of Virginia denied his appeal of the state habeas dismissal on October 2, 2018, and denied his petition for rehearing on November 20, 2018, he promptly filed his § 2254 petition, placing it in the prison mail on February 14, 2019, 86 days after November 20, 2018, well within the 99 days he would have had left if the state matter had been properly pending until November 20, 2018. However, once the habeas court lost jurisdiction over the case and no appeal was filed within 30 days of the order becoming final on October 11, 2016, as discussed above, the matter was no longer properly pending after November 10, 2016, and the limitation clock resumed running on that date.

Unfortunately for Graham, he did not know that the state case was no longer pending, as the court continued to have hearings and sign orders granting motions, and Graham and the state both continued to file pleadings and legal arguments before the habeas court. The appeal deadline, November 10, 2016, came and went long before he or the Commonwealth of Virginia learned that his case was no longer pending. The statute expired on February 23, 2017, several months before Graham learned that the Supreme Court of Virginia rejected his appeal of the dismissed habeas claims on June 23, 2017, and nearly a year before the habeas court would rule on February 7, 2018, that it had lost jurisdiction to adjudicate the amended claims.

In recognizing that the AEDPA's statute of limitations is subject to equitable tolling, the

Court in *Holland* stated:

> [W]e have followed a tradition in which courts of equity have
> sought to relieve hardships which, from time to time, arise from a
> hard and fast adherence to more absolute legal rules, which, if
> strictly applied, threaten the evils of archaic rigidity. The
> "flexibility" inherent in "equitable procedure" enables courts to
> meet new situations [that] demand equitable intervention and to
> accord all the relief necessary to correct . . . particular injustices.

560 U.S. at 650 (internal quotations and citations omitted). In sum, the Court recognized that

there are circumstances, "often hard to predict in advance," that warrant equitable treatment in

some cases. *Id.* The compounding of errors in the litigation of a case for more than a year after

it is no longer pending, when neither the defendant, the state, nor the habeas trial judge realized

that the case was no longer pending, seems to fall within these unusual circumstances and to

warrant equitable tolling, given the vital role that habeas corpus plays in protecting constitutional

rights. This court will toll the statute of limitations and treat Graham's petition as if it were

timely filed.

### 2. Exhaustion

To exhaust his claims, a petitioner must present his federal constitutional claims to the

highest state court before he is entitled to seek federal habeas relief. *O'Sullivan v. Boerckel*, 526

U.S. 838, 842 (1999). Failure to do so "deprive[s] the state courts of an opportunity to address

those claims in the first instance." *Coleman v. Thompson,* 501 U.S. 722, 732 (1991). When a

petitioner has no more state remedies available, his claim has been exhausted. When the state

court rules that petitioner has procedurally defaulted his claims, those claims are simultaneously

exhausted and defaulted. *Id.* In Graham's case, the state's highest court never considered any of

his claims on the merits because the Supreme Court of Virginia ruled that his appeal was untimely, or in other words, procedurally defaulted.

Typically, the federal courts will not conduct habeas review of a procedurally defaulted claim, if the decision of the state court "rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). The state high court's ruling of June 23, 2017, that Graham's appeal of the dismissed habeas claims was untimely, was based solely on state law, in particular Virginia Supreme Court Rules 5:9(a) (requiring notice of appeal within 30 days of final order) and 1:1 (divesting the trial court of jurisdiction 21 days after order becomes final). Those state procedural rules are clearly independent of the federal issues involved in this case. Both rules are firmly established and regularly followed in Virginia. *See Whitt v. Commonwealth*, 739 S.E.2d 254, 261 (Va. Ct. App. 2013) ("A late notice of appeal . . . cannot be cured."); *Super Fresh Food Mkts. of Va. v. Ruffin*, 561 S.E.2d 734, 739 (Va. 2002) (dismissing appeal for untimely notice of appeal); *Shank v. Dep't of Soc. Servs.*, 230 S.E.2d 454, 456 (Va. 1976) (concluding that mother had no standing to intervene in adoption case more than 21 days after order terminating her parental rights had been entered); *Jones v. Commonwealth*, 218 S.E.2d 538, 539 (Va. 1976) (holding that court has no jurisdiction to allow withdrawal of guilty plea more than 21 days after judgment entered).

Because Graham's claims were procedurally defaulted under independent and adequate state grounds, procedural default precludes consideration of his claims by this court, unless Graham meets the requirements to overcome procedural default. To overcome this default, Graham must show cause for the default and actual prejudice as a result, or he must present a claim of actual innocence. *Coleman*, 501 U.S. at 750.

### 3. Standard of review for procedurally defaulted claims

Cause for procedural default requires the existence of some objective factor, external to the defense and not fairly attributable to the prisoner. *Id.* at 756–57. Negligence of trial counsel is usually not sufficient cause, unless it rises to the level of constitutionally ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 486–88 (1984). Ineffective assistance of state habeas counsel generally cannot excuse default because there is no constitutional right to counsel in state post-conviction proceedings. *Coleman*, 501 U.S. at 754–55. The Supreme Court has recognized an exception, however, when habeas claims involve ineffective assistance of trial counsel that a prisoner cannot raise for the first time until post-conviction proceedings. *Martinez v. Ryan*, 566 U.S. 1, 13–15 (2012). If the conditions of *Martinez* are met, that satisfies both the cause and prejudice prongs of *Coleman*.

To overcome procedural default under *Martinez*, the following conditions must be shown: (1) the claim of ineffective assistance of trial counsel must be a "substantial claim"; (2) the "cause" is the lack of habeas counsel or ineffectiveness of habeas counsel under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984); (3) the state post-conviction proceeding was the first time ineffective assistance of counsel was raised; and (4) the state post-conviction proceeding was the first one in which petitioner was allowed by state law to raise the claim. *Martinez*, 566 U.S. at 13–15; *Trevino v. Thaler*, 569 U.S. 413, 423 (2013).

In Virginia, claims for ineffective assistance of counsel can only be raised for the first time in state habeas proceedings. *Blevins v. Commonwealth*, 590 S.E.2d 365, 368 (Va. 2004). Further, Graham raised his ineffective assistance claims (or tried to) in the state habeas proceeding. Therefore, Graham meets the third and fourth prongs of the *Martinez* requirements.

The court concludes that the second prong has also been met. Graham's state habeas counsel failed to file the amended petition within the time set forth in the order; he failed to ensure entry of an order vacating the order before expiration of 21 days, and because of both omissions just mentioned, he failed to timely appeal the dismissed habeas claims.

It is axiomatic that a competent attorney must be familiar with firmly established and regularly followed rules of court, such as time limits for filing a notice of appeal and when a trial court loses jurisdiction over a matter after entering a final order, especially when the consequences of being unfamiliar with the rules are so drastic, resulting in dismissal of a defendant's case. *See Evitts v. Lucey*, 469 U.S. 387, 392 (1985) ("[T]here is no challenge to the District Court's finding that respondent indeed received ineffective assistance of counsel on appeal. Respondent alleges—and petitioners do not deny in this Court—that his counsel's failure to obey a simple court rule that could have such drastic consequences required this finding."). Counsel was aware of the 21-day rule, or he would not have sought an order suspending the August 12, 2016 order. In fact, he circulated an order, in accord with the court's ruling on August 30, but did not follow-up when the state's attorney failed to endorse and return the order to him. (Va. S. Ct. R. 80.) The Bench notes summarizing the court's intent is not the same as a written order, and the court speaks only through its written orders. *Roe v. Commonwealth*, 628 S.E.2d 526, 528 (Va. 2006). Habeas counsel provided constitutionally ineffective assistance in failing to get a written order entered, including a provision that the time for amending certain claims was to be extended. Without such a written order, the January 11, 2017 order, addressing only the dismissed claims and noting that the order of August 12 remained in full force and effect, left Graham with no trail of a timely order extending the time for amending the claims he had been given leave to amend. Further, without a written order

suspending or abeying the August 12 final order, he allowed the time for filing a timely notice of appeal to expire.

Having established the second, third, and fourth prongs of *Martinez*, the court will consider whether any of the defaulted claims are "substantial." As the term is used in *Martinez*, a substantial claim is one that has some merit. 566 U.S. at 14. Claims that are substantial satisfy the prejudice prong for overcoming procedural default. However, a finding that a claim is substantial is not the same as deciding that a petitioner has won his § 2254 claim; rather, petitioner has merely avoided the procedural default bar for that claim. *Id.* at 15. The court must evaluate each claim individually to determine if it is substantial, and if so, the court will then evaluate the claim on its merits.

## B. Graham's Claims of Ineffective Assistance of Counsel (IAC)

### 1. Standard of review for IAC claims

To prevail on a claim for ineffective assistance of counsel, Graham must establish that trial counsel's performance was so deficient that she was not functioning as counsel guaranteed by the Sixth Amendment and that such deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance requires a showing that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 688. A reviewing court must not rely upon "the distorting effects of hindsight," but must presume that counsel's decisions and actions fell within the wide range of reasonable strategy decisions." *Id.* at 689–90.

To have a meritorious *Strickland* claim for ineffective assistance of counsel, Graham must also show that he was prejudiced by any alleged deficiency in his trial counsel's performance. In other words, Graham must show that there was "a reasonable probability that

the outcome of the proceedings would have been different, . . . a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

### 2. Whether Graham's IAC claims are substantial

#### a. *Failure to conduct a full and proper voir dire*

The state habeas court considered this claim on its merits and dismissed the claim. Graham's procedural default prevented the highest state court from considering the issue, but because it was addressed on the merits in the habeas proceeding, the concern underlying the equitable remedy in *Martinez*, that a defendant should have one fair opportunity to present a claim for ineffective assistance of trial counsel on its merits, was achieved for this issue.

Graham's complaint is that counsel failed to discover that one of the panelists, Larry Hines, was the first cousin of the Commonwealth Attorney's father (*id.* at 55), and had this been known, counsel would have struck Hines from the panel rather than seating him as a juror. In the order of August 12, 2016, dismissing this claim, the court found that Graham failed to demonstrate that a full and proper voir dire was not conducted and failed to demonstrate that the juror was prejudiced or biased. (Habeas R. 198.) In other words, Graham failed to offer evidence that trial counsel's performance was deficient or that Graham suffered any prejudice as a result of counsel's performance.

The state court's decision is a reasonable determination of the facts, based on the record. Voir dire regarding potential bias was thorough, by the court and by both counsel. Panel members were asked about whether they knew anything about the case from the news or otherwise. They were asked about their relationship, if any, to the parties and counsel. In particular, the court asked if any panel members were friends, clients, or former clients of the attorneys; the Commonwealth Attorney asked if his office had prosecuted a case against anyone

or any members of their families.  (Trial Tr., April 17–19, 2006, vol. 1, at 5–40.)  Graham alleges

that counsel should have asked specifically if the juror was related to the Commonwealth

Attorney and that she should have been on notice to do so because the juror and the

Commonwealth Attorney trying the case shared the same last name, Hines.  The name is not so

unusual, however, that this should have necessarily raised questions in trial counsel's mind.[3]

During voir dire, juror Hines acknowledged knowing Graham, because Graham and his family

were customers at Lee Tractor, where the juror worked.  (*Id.* at 10–11.)  Nonetheless, the juror

believed he could sit as a fair and impartial juror on the case.  (*Id.*)

When Graham first raised the issue regarding juror Hines, long after his conviction, the

prosecuting attorney submitted an affidavit, acknowledging that juror Hines was his father's first

cousin.  (Habeas R. 55.)  He also indicated that, to his knowledge, he had never spoken with

juror Hines prior to voir dire in Graham's trial, and he had never had a personal, social, or

familial relationship with the juror.

Even if defense counsel should have asked if this juror or any of the jurors were related to

the Commonwealth Attorney, Graham has failed to introduce any evidence that the juror was

actually biased.  The Supreme Court of Virginia dismissed a similar ineffective assistance of

counsel claim in *Porter v. Warden*:

> [The IAC claim] satisfies neither the "performance" nor the
> "prejudice" prong of the two-part test enunciated in *Strickland*.
> The record, including the trial transcript and [an] affidavit of
> counsel, demonstrates that counsel did not know that Juror
> T[reakle] had a brother in law enforcement.  *More importantly,*
> *[Appellant] has provided no admissible evidence that Juror*
> *T[reakle] was biased against [Appellant] as a result of his*
> *brother's employment.*

---

[3]  The phone directory (Whitepages.com) identifies 475 people in Jonesville, Virginia, with the last name
"Hines."  Jonesville is just one of the towns in Lee County.

722 S.E.2d 534, 549 (Va. 2012) (emphasis added).  In the subsequent federal habeas by Porter, the Fourth Circuit Court of Appeals quoted the state court's decision favorably, noting that this is a reasonable application of law to an ineffective assistance claim, where *Strickland* imposes a high threshold for a claimant to prevail.  *Porter v. Zook*, 898 F.3d 408, 423 (4th Cir. 2018).

Graham argues that bias should be presumed because of the family relationship between the juror and the Commonwealth Attorney.  The case he cites for this proposition, however, conclusively implies bias when a juror is related to the *victim.  Gray v. Commonwealth*, 311 S.E.2d 409, 410 (Va. 1984).  There is a difference between relationship to a victim or party and relationship to the prosecuting attorney.  "The doctrine of implied bias is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances.  *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988).  The Fourth Circuit Court of Appeals has questioned whether the implied bias doctrine remains viable after the Supreme Court's decision in *Smith v. Phillips*, 455 U.S. 209 (1982).  *Person*, 854 F.2d at 664; *Fitzgerald v. Greene*, 150 F.3d 357, 365 (4th Cir. 1998).  The Court in *Smith* reversed a new trial awarded to the petitioner by the district court and by the Second Circuit Court of Appeals.  The state court considered petitioner's request to set aside his conviction because one of the jurors had applied for a job in the prosecutor's office while he was serving on the jury.  Following a hearing in which the juror testified that his application had nothing to do with his deliberations in the case and that his decision in the trial was based only on the evidence adduced at the hearing, the state judge found no evidence of actual bias.  On federal habeas review, the district court accepted the state judge's factual finding, but implied bias as a matter of law, because "the average man in [the juror's] position would believe that the verdict of the jury

would directly affect the evaluation of his job application." 455 U.S. at 215. The circuit court affirmed on alternate grounds. In reversing the grant of a new trial, the Court discussed the history of implied bias cases, concluding that automatic disqualification of a juror and/or grant of a new trial are not necessary because of a juror's relationship with the Government. Rather, all that is required is the opportunity to prove actual bias, if a litigant believes such bias exists. *Id.* at 217. In a concurring opinion, Justice O'Connor agreed that "in most instances" the trial judge's ability to observe the juror's demeanor and the facts of the particular case would be sufficient to determine the existence of improper bias, but she said, "[T]here are some extreme situations that would justify a finding of implied bias," noting that each case must turn on its own facts. *Id.* at 222.

Courts that still rely on the implied bias doctrine after *Smith* have considered which relationships create an extreme situation sufficient to imply bias as a matter of law; in doing so, these courts focus on the closeness of the relationship. *See United States v. Needham*, 852 F.3d 830, 840 (8th Cir. 2017) (holding that juror's prior relationship with prosecutor's grandmother was insufficient to imply bias); *United States v. Mitchell*, 690 F.3d 137, 147–48 (3d Cir. 2012) (remanding for determination of whether juror, a cousin of the prosecutor, was a first cousin or a more distant relation).

The state habeas judge considering this claim on the merits also found no prejudice. Based upon the review of the record, the state judge's decision is neither an unreasonable determination of facts nor an unreasonable application of federal law. Nothing in the record contradicts the court's determination that Hines could sit as a fair and impartial juror. The judge had the opportunity to observe Hines' demeanor before trial and in follow-up questions on voir dire. Further, because the evidence of guilt was strong, Graham cannot show a reasonable

probability that the outcome would have been different with a different juror. This claim is not a substantial claim sufficient to overcome Graham's procedural default on the issue.

### b. *Failure to request a mistrial after Summer Noe's improper testimony*

As in the prior claim, the circuit court ruled on this habeas claim on the merits, but the highest state court did not review the decision because of Graham's default. Graham alleges that his trial counsel was ineffective because she failed to move for a mistrial when Summer Noe testified that she had a sexual relationship with the defendant. The circuit court judge dismissed this claim, finding that "counsel was not deficient for not seeking a mistrial because that testimony was stricken by the Court [in response to counsel's objection] and the jury was admonished not to consider it as evidence." (Habeas R. 200.)

Failure to request a mistrial is a tactical decision left to the sound discretion of counsel. *United States v. Chapman*, 593 F.3d 365, 368–69 (4th Cir. 2010). Courts applying the *Strickland* standard are required to be highly deferential to strategic decisions of counsel, and counsel's failure to request a mistrial does not constitute deficient performance under the facts revealed in the transcript.

Further, Graham cannot establish any likelihood that a mistrial would have been granted, nor can he establish that the cautionary instruction of the trial court was inadequate. Jurors are presumed to follow the instructions of the court. *United States v. Zelaya*, 908 F.3d 920, 930 (2018). Therefore, this claim is not a substantial claim for constitutionally ineffective assistance of counsel, and Graham has not overcome his procedural default of this issue.

*c. Failure to obtain transcript of 2005 trial*

Graham alleges that trial counsel was ineffective because she failed to obtain transcripts of the 2005 trial that ended in a mistrial.  He contends that these transcripts were necessary to show inconsistencies in witness testimony between the 2005 trial and the 2006 trial, particularly in the testimony of C.D., but also in the testimony of C.D.'s aunt and of Lt. John Woodard of the Lee County Sheriff's Department.  He further contends that counsel should have used the 2005 transcript to prepare for the 2006 trial.  In support of this contention, Graham cites *Britt v. North Carolina*, 404 U.S. 226 (1971).

In *Britt*, the Court acknowledged that one could assume "that a transcript of a prior mistrial would be valuable to the defendant in at least two ways: as a discovery device in preparation for trial, and as a tool at the trial itself for the impeachment of prosecution witnesses."  *Id.* at 228.  The issue in *Britt* was not ineffective assistance of counsel, but the equal protection right of a defendant, *upon request*, to get a free transcript if he was indigent and needed the transcript for appeal or a new trial.  The Court reaffirmed its prior holdings that an indigent defendant cannot be denied a free copy of the transcript, upon request, *unless* the petitioner "had available an informal alternative which appears to be substantially equivalent to a transcript."  *Id.* at 230.  Because Britt admitted that he had an informal alternative available, the Court found no error in denying him a transcript.  *Id.* at 130.

Neither *Britt* nor any other Supreme Court case has discussed whether counsel's failure to obtain a transcript of a prior mistrial constitutes deficient performance.  However, if alternatives to a formal transcript are sufficient to satisfy equal protection, then Graham would need to allege not only counsel's failure to obtain a transcript of the 2005 mistrial, but also the lack of any suitable alternative materials that she could have used to prepare for trial and

impeach witnesses. He cannot make such an allegation based on the record here. The Court has recognized that counsel's notes can be an adequate substitute for a court reporter's transcript (although the availability of such notes does not justify denying a request for a transcript). *Eskridge v. Washington State Bd. of Prison Terms & Paroles*, 357 U.S. 214, 215 (1958); *Britt*, 404 U.S. at 230 n.6. Graham's trial counsel was prepared for trial, and she impeached prosecution witnesses, especially C.D. The manner of impeachment and extent of cross-examination are tactical decisions of counsel, and under *Strickland*, counsel is presumed to have made such decisions in the exercise or reasonable professional judgment. 466 U.S. at 690. Graham's criticism of counsel's impeachment techniques fails to show that counsel's performance was outside prevailing professional norms. *Hunt v. Nuth*, 57 F.3d 1327, 1332–33 (4th Cir. 1995).

Nor has Graham established prejudice, the probability of a different outcome if counsel had used the 2005 transcript. Graham has not provided this court with copies of the 2005 transcript, but his petition alleges that C.D.'s testimony changed regarding: (1) details after their alleged sexual encounter on July 28, 2001, (2) whether and how often she had spoken to Graham's mother on the phone, and (3) whether she helped Graham move furniture in the house he was fixing up. Counsel cross-examined C.D. at length about telephone conversations between C.D. and Graham's mother, obtaining an admission from C.D. that she had told Graham's mother—after the first warrant against Graham—that nothing sexual had happened between them. (Tr., vol. 1, at 244–45.) C.D. also admitted testifying in court in October 2001 that she had made the accusations up, but at trial claimed her October 2001 testimony was false. (*Id.*) If her admission of perjury and inconsistent statements about the existence of the sexual relationship did not cause the jury to reject C.D.'s testimony, it seems highly unlikely that

additional impeachment from the transcript on the same and less important issues would cause the jury to reach a different outcome.

The same is true of the other witnesses cross-examined by counsel. John Woodard, the retired investigator from the Lee County Sheriff's Office, admitted on cross-examination that he had told counsel several previous times that Graham had never admitted the relationship with C.D. and that he had not testified at the prior trial that Graham said, "Love makes a man do strange things." (*Id.* at 342–43.)

Because Graham's allegations in this claim fail to establish either deficient performance or prejudice, this is not a substantial claim, and the procedural bar is not overcome.

> d. *Failure to subpoena John Bishop and Elaine Frasier*

Graham alleges that trial counsel was ineffective because she failed to subpoena John Bishop and Elaine Frasier to testify at the 2006 trial, although they had testified favorably at the 2005 trial. Choosing what witnesses to call is a strategic decision of counsel. *Gonzales v. United States,* 553 U.S. 242, 249 (2008); *United States v. Dehlinger*, 740 F.3d 315, 323 (4th Cir. 2014). Evaluation of the risks and benefits of expected testimony is the core of strategic decisions "entrusted to the professional judgment of trial counsel." *Dehlinger,* 740 F.3d at 325; *United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004). Under *Strickland*, such strategic decisions are entitled to a strong presumption of reasonableness, based on the circumstances that appeared at the time of counsel's decision, not based on 20/20 hindsight. 466 U.S. at 689.

Graham has not provided the 2005 transcript of Bishop's testimony and Frasier's testimony, but based on his description of Bishop's anticipated testimony, the court need not decide whether counsel's failure to subpoena Bishop was deficient performance. Bishop's testimony presumably would have been cumulative of the partial alibi testimony of Lisa Stocker,

whom Bishop was dating in 2001.  There is no prejudice from a lawyer's decision not to call a witness whose testimony would be cumulative.  *Dehlinger*, 740 F.3d at 323; *Huffington v. Nuth*, 140 F.3d 572, 581 (4th Cir. 1998) (citation omitted).

Although the court makes no finding regarding performance, the record is replete with possible justifications for counsel's decision not to call Elaine Frasier, C.D.'s biological mother, from whom C.D. was estranged.  C.D.'s testimony portrayed Frasier as a chronic drunk, abusive, and incapable of raising her children.  (Tr., vol. 1, at 203, 206–07, 217.)  Age 19 at the time of the trial in 2006, C.D. testified that she had no relationship at all with her mother for the previous five years, and she refused to refer to her as Mom.  (*Id.* at 199.)  She had lived with her paternal Aunt, Patricia Coomer, from October 2001 until adulthood, and that is the person she called Mom.  (*Id.* at 242, 263.)  With an introduction like that, trial counsel reasonably could have concluded that Frasier's testimony would not be taken seriously or would be considered biased against C.D.  *See Huffington,* 140 F.3d at 581.  Further, Frasier's proposed testimony involved a time period more than six months earlier than the alleged sexual relationship and would have little relevance to whether C.D. was telling the truth about the sexual relationship.  At the time of the alleged sexual relationship, C.D. had been living at her grandfather's home, not Frasier's home.  Graham asserts that Frasier would testify that she had not seen any inappropriate behavior between Graham and C.D. at her home, that Graham had not visited her home as often as C.D. said, that Graham had played cards with C.D. and family at her home only once or twice, and that the coffee table had a divider under it, so C.D. could not have been playing footsie with Graham during card games.  Counsel could reasonably determine that this testimony had very little probative value to the defense.

These same factors which counsel might have considered in choosing not to call Frasier are the reasons that Graham cannot show prejudice caused by the failure to have Frasier testify. There is no reasonable probability that the outcome of the trial would have been different if Frasier had testified.  The testimony of C.D., corroborated in part by her brother, was sufficient to support the jury's verdict.  Evidence that Graham wrote letters and sent flowers to C.D. after the Juvenile and Domestic Relations Court case against him was dismissed, and that he had the letters delivered to her secretly at school through other friends, also supported the jury's verdict, and when he opened the door during his testimony by denying that he ever had romantic feelings, the passages from his own letters sealed the outcome.  Nothing Frasier could have testified to would have changed the outcome of the trial.

Because Graham cannot show prejudice as a result of counsel's failure to call Bishop and Frasier as witnesses, this claim fails to be substantial and is procedurally barred.

>    e.    *Failure to make effective use of Alice Graham's testimony*

Alice Graham, petitioner's mother, testified at the trial in 2005.  She passed away before the 2006 trial date.  Trial counsel ordered the transcript of her testimony for possible use at trial. Counsel wanted to introduce some records (notes and calendar entries) that Mrs. Graham had kept regarding Graham's lawnmowing work (on some days that C.D. alleged she and Graham were together).  For reasons not stated for the record, counsel had decided she was not going to read Mrs. Graham's testimony into evidence at the second trial, but she wanted to get the records in, with someone authenticating Mrs. Graham's handwriting.  The trial court did not allow her to do so.  (Tr., vol. 1, at 345–50.)

As with the witnesses discussed in the previous section, deciding whether to use Mrs. Graham's previous trial testimony required counsel to assess and balance the perceived benefits

against perceived risks of introducing the testimony. *Terry*, 366 F.3d at 317. Her strategic decision is presumed to be reasonable trial strategy. *Id.* Virginia Rule of Evidence 2:804(b)(1) allows a party to read into evidence at trial prior testimony of a witness if (1) the witness is unavailable for trial; (2) the prior testimony was under oath; (3) the prior testimony was accurately recorded; and (4) the party against whom the prior testimony is offered was present, represented by counsel, and afforded the opportunity to cross-examine the witness when the prior testimony was given. The opportunity for cross-examination, of course, allows for fair presentation of the entire testimony. Defense counsel would not be able to introduce Mrs. Graham's prior direct testimony without the government being able to introduce the prior cross-examination.

Graham has not said exactly how or why the court should consider counsel's decision not to read the prior testimony unreasonable. The court need not rule on the performance prong, however, because Graham has not been prejudiced by counsel's failure to read Mrs. Graham's testimony into evidence. First, Mrs. Graham testified that Graham spent the entire night with Peggy Allen on October 3, 2001, according to notes she made on her calendar. (Tr. Excerpt, 4/22/2005, at 12.) This directly contradicts the testimony of Lisa Stocker, who said she went to the movies with Graham on the night of October 3, 2001. In addition to the risk of contradicting an alibi witness, any positive benefit of Mrs. Graham's testimony was likely to be discounted by the jury because of her relationship to Graham, as testimony of a defendant's family members is "of less value than that of objective witnesses." *Huffington*, 140 F.3d at 581 (citations omitted). In sum, Mrs. Graham's prior testimony does not create a reasonable probability of a different outcome at trial.

Because Graham cannot show prejudice from the failure to use Mrs. Graham's prior testimony at trial, he has failed to establish that this is a substantial claim, and, thus, he has failed to overcome the procedural bar.

### f. Failure to put Graham's cell phone records into evidence

Graham alleges that trial counsel failed to introduce his cell phone records to impeach C.D.'s testimony that Graham gave her his cell phone in mid-to-late September 2001 and that she used this phone to call him on various dates, including October 3, 2001, until she returned the phone in January 2002. (Tr., vol. 1, at 253–55.) Review of the record belies this claim.

Counsel cross-examined C.D., asking her what the phone number was and what company carried the service on the phone, but she did not remember. (*Id.*) She asked Graham to identify the cell phone records from the time he first got the phone (August 30, 2001) through October 3, 2001 (the cut-off date imposed by the court, because calls after October 3 were not within the time charged in the indictment). He identified his phone number and highlighted in the records that his only call on the cell phone on October 3, 2001, was to check his voicemail and that he received no incoming calls that day. Finally, the phone records were introduced into evidence as Exhibit 10. (*Id.*, vol. 2, at 475–76, 493–500.)

Because this claim is factually contradicted by the record, it is not a substantial claim and remains procedurally defaulted.

### g. Failure to object to C.D.'s hearsay testimony about why her biological mother did not allow C.D. to see Graham anymore in early 2001

C.D. testified that her mother and mother's boyfriend stopped allowing Graham to come to her house in early 2001. When asked why, she said that "Elaine told me that she had heard something about him touching a little girl . . . ." (Trial Tr., vol. 1, at 148.) Defense counsel did not object to the prejudicial hearsay statement.

"Numerous choices affecting the conduct of trial, including the objections to make . . .

depend . . . upon tactical considerations of the moment and the larger strategic plan for the trial."

*Gonzales*, 553 U.S. at 249. The Supreme Court has recognized that waiving an objection to

hearsay and even waiving a confrontation clause objection can be a strategic decision of counsel.

*Woods v. Etherton*, 136 S. Ct. 1149, 1152–53 (2016). Defense counsel could reasonably have

decided that an after-the-fact objection would call attention to the testimony and highlight its

importance in the minds of the jurors, thereby increasing the testimony's damage. Accordingly,

Graham has not established deficient performance.

Nor has Graham established a reasonable probability that the outcome of the trial would

have been different if counsel had objected to the hearsay statement. The other evidence in the

record, particularly the passages from Graham's letters to C.D., was overwhelming evidence,

likely to lead to a conviction even if counsel had objected to the hearsay.

Because Graham has shown neither deficient performance nor prejudice, this claim is not

substantial and does not overcome Graham's procedural default.

### 3. Graham's claim that the state denied him a fair opportunity to develop his IAC claims

A state is entitled to enforce its procedural rules. As previously discussed in the section

on exhaustion, Virginia's Rule 1:1, divesting a trial court of jurisdiction after 21 days, and Rule

5:9(a), requiring notice of appeal to be filed within 30 days of final order, are both state

procedural rules, independent of any federal issue, and they are firmly established and regularly

followed in the Commonwealth. Accordingly, the state had every right to dismiss Graham's

petition under the independent and adequate state procedural grounds. *Breard v. Pruett*, 134

F.3d 615, 619 (4th Cir. 1998). "It is not the province of a federal habeas court to reexamine

state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

Because of the importance of a litigant's right to present his IAC claims, however, the Court in *Martinez* established a mechanism for defendants to present defaulted but substantial IAC claims in federal court if the default is caused by lack of state habeas counsel or ineffective habeas counsel. 566 U.S. at 13–15. That opportunity has been provided herein, and Graham has not demonstrated that any of his IAC claims are substantial. The standard for reviewing counsel's performance "is a most deferential one." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). A defendant is not entitled to perfect representation, only to competent representation. *Id.* at 110. After reviewing the record and all arguments presented, the court is satisfied that Graham received competent representation in this case.

## III. CONCLUSION

For the reasons stated, the court will grant the respondent's motion to dismiss. Further, concluding that Graham has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(1), a certificate of appealability will be denied.

An appropriate order will be entered.

Entered: March 27, 2020.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge